**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

|  |  |
|---|---|
| NESLY PIERRE, LOUINE JEAN-LOUIS, and CARLOS SAINT AUBIN, on their own behalf and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JBS USA FOOD COMPANY, and SWIFT BEEF COMPANY,<br><br>Defendant. | Civil Action No. _____ |

---

## CLASS ACTION COMPLAINT

---

1.     This case arises from JBS USA Food Company's and Swift Beef Company's (collectively, "JBS" or "Defendants") recruitment and subsequent employment of Plaintiffs and other Haitian individuals at the JBS meat processing plant in Greeley, Colorado. After luring Plaintiffs and other Haitian individuals to the plant with promises of high-paying jobs that required no English language skills and employer-provided housing in nearby apartments, Defendants instead charged them to live in squalid conditions and subjected them to dangerous work conditions without proper training. Defendants did so based on Plaintiffs' and the other Haitian individuals' race, color, nationality, ancestry and ethnicity in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981 and § 1981a ("Section 1981"). JBS's recruitment of Haitian

workers under false pretenses also constitutes a violation of C.R.S. § 8-2-104, (Obtaining Workman by Misrepresentation Unlawful).

2.    Plaintiffs also bring claims arising under the Colorado Wage Claim Act, C.R.S. § 8-4-101, *et seq.* (the "Wage Claim Act") and the Colorado Minimum Wage Act, C.R.S. § 8-6-101, *et seq.*, and their implementing regulations, *see, e.g.,* 7 Colo. Code Regs. § 1103-1, for unlawful business expenses incurred by Plaintiffs and other Haitian employees for the benefit of JBS; and unjust enrichment and civil theft claims for the recruitment fees and unreasonably high rent charges for employer-provided housing. By and through their undersigned counsel, the Plaintiffs file this Class Action Complaint on their own behalf and on behalf of all others similarly situated.

## JURISDICTION AND VENUE

3.    This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, this case arising under the laws of the United States, including Title VII and Section 1981.

4.    Plaintiffs request that this Court exercise its supplemental jurisdiction over their claims under the Colorado Wage Claim Act, C.R.S. § 8-4-101, *et seq.* (the "Wage Claim Act") and the Colorado Minimum Wage Act, C.R.S. § 8-6-101, *et seq.*, and their implementing regulations, *see, e.g.,* 7 Colo. Code Regs. § 1103-1; C.R.S. § 8-2-104, (Obtaining Workman by Misrepresentation Unlawful), C.R.S. § 18-4-405 (Civil Theft) and common law, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed within the jurisdictional boundaries of the United States District Court for the District of Colorado.

6.      Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims. Plaintiff Louine Jean-Louis filed a charge of race, color, and national origin discrimination individually and on behalf of all similarly situated workers employed by JBS on or about October 18, 2024. Plaintiffs requested their right to sue from the EEOC in November 2024.

## PARTIES

7.      Plaintiffs and Putative Class Members are Black, of Haitian ancestry, and citizens of Haiti. At all material times, Plaintiffs and Putative Class Members were employed, or being recruited for employment, at JBS's Greeley, Colorado meat processing plant.

8.      Plaintiffs and Putative Class Members' native language is Haitian Creole.

9.      Defendant JBS USA Food Company is a Delaware corporation and is headquartered at 1770 Promontory Circle, Greeley, Colorado 80634.

10.     Defendant Swift Beef Company is a Delaware corporation and is headquartered at 1770 Promontory Circle, Greeley, Colorado 80634.

11.     JBS USA Food Company is the parent company of Swift Beef Company.

12.     At all relevant times, Defendants have continuously been an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. §§2000e(b), (g) and (h), and Section 1981.

13.    At all relevant times, Defendants were/are the employers of Plaintiffs within the meaning of Title VII, Section 1981 and C.R.S. § 8-4-101(6).

14.    At all relevant times, Plaintiffs were "employees" of Defendants within the meaning of C.R.S. § 8-4-101(5).

### THE DANGERS OF MEATPACKING

15.    Meatpacking jobs are among the most dangerous in the U.S.[1] Workers in meatpacking plants labor in environments where workspaces are often freezer-cold or sweltering, crowded, slippery with grease and blood, and filled with deafening noise and the stench of dead animals and industrial chemicals.[2] They are regularly exposed to "industrial equipment, stressful

---

[1]    *See, e.g.*, *Meatpacking: Overview*, OSHA, https://www.osha.gov/meatpacking [https://perma.cc/FSP5-F2GR] (last visited Dec. 10, 2025); Ethan W. Smith, *Working at the Speed of Profit: Meatpacking Workers and the Century-Old Problem of Line Speed*, 48 N.Y.U. REV. L. & SOC. CHANGE 121, 127–30 (2025) [hereinafter Smith, *Speed of Profit*]; Debbie Berkowitz & Patrick Dixon, *An average of 27 workers a day suffer amputation or hospitalization, according to new OSHA data from 29 states: Meat and poultry companies remain among the most dangerous,* ECONOMIC POLICY INSTITUTE, WORKING ECONOMICS BLOG (Mar. 30, 2023), https://www.epi.org/blog/an-average-of-27-workers-a-day-suffer-amputation-or-hospitalization-according-to-new-osha-data-from-29-states-meat-and-poultry-companies-remain-among-the-most-dangerous/; Amy Braunschweiger & Matt McConnell, *Interview: How the US is Making Meatpacking Jobs Even More Dangerous,* HUMAN RIGHTS WATCH (Sept. 14, 2019), https://www.hrw.org/news/2019/09/04/interview-how-us-making-meatpacking-jobs-even-more-dangerous; HUMAN RIGHTS WATCH, *"WHEN WE'RE DEAD AND BURIED, OUR BONES WILL KEEP HURTING,": WORKERS' RIGHTS UNDER THREAT IN US MEAT AND POULTRY PLANTS* (Sept. 14, 2019), https://www.hrw.org/report/2019/09/04/when-were-dead-and-buried-our-bones-will-keep-hurting/workers-rights-under-threat [hereinafter HRW, DEAD AND BURIED]; Andrew Wasley, Christopher D. Cook & Natalie Jones, *Two Amputations a Week: the Cost of Working in a US Meat Plant,* THE GUARDIAN (Jul. 5, 2018), https://www.theguardian.com/environment/2018/jul/05/amputations-serious-injuries-us-meat-industry-plant [hereinafter THE GUARDIAN, *Two Amputations a Week*]; U.S. GOV'T ACCOUNTABILITY OFF., GAO-16-337, WORKPLACE HEALTH AND SAFETY: ADDITIONAL DATA NEEDED TO ADDRESS CONTINUED HAZARDS IN THE MEAT AND POULTRY INDUSTRY 13 (2016), https://www.gao.gov/assets/gao-16-337.pdf.

[2]    HRW: DEAD AND BURIED, *supra* note 1, at 27.

4

repetitive motions, sharp-edged hooks, knives, and band saws, heavy bags and boxes, and unpredictable animals, among uncountable other hazards."[3]

16.    The job is essentially a "disassembly" line, where animals are killed, gutted, sliced, chopped and packaged for sale by thousands of workers flanking the snake-like "line" that ferries the animal along.[4] Workers use sharp tools in close proximity, performing thousands of forceful, repetitive motions throughout their eight to twelve hour shifts.[5]

17.    The sheer volume and speed of slaughtering operations in the meat and poultry industry create enormous danger.[6] Every year, approximately 25 to 27 percent of meatpacking workers are reported ill or injured, among the highest injury rates of any job.[7] Every week, a meatpacking worker suffers a severe injury like amputations, fractured fingers, second-degree burns and head trauma, a rate three times higher than the average American manufacturing worker.[8] Beef workers in particular are nearly seven times more likely than their manufacturing counterparts to suffer musculoskeletal disorders, like carpal tunnel, tendonitis, and "trigger finger," a condition in which a finger or thumb becomes stuck in a bent position from repetitive motion.[9]

---

[3] *Id.*

[4] *Id.;* HUMAN RIGHTS WATCH, BLOOD, SWEAT AND FEAR: WORKERS' RIGHTS IN U.S. MEAT AND POULTRY PLANTS 24 (2004), https://www.hrw.org/report/2005/01/24/blood-sweat-and-fear/workers-rights-us-meat-and-poultry-plants [hereinafter HRW: BLOOD, SWEAT AND FEAR].

[5] HRW: BLOOD, SWEAT AND FEAR, *supra* note 4, at 38-39.

[6] *Id.* at 31-38.

[7] Jennifer Dillard, *A Slaughterhouse Nightmare: Psychological Harm Suffered by Slaughterhouse Employees and the Possibility of Redress Through Legal Reform*, 15 GEO. J. ON POVERTY L. & POL'Y 391, 393 (2008) [hereinafter Dillard, *Slaughterhouse Nightmare*]; Vanessa Hemenway, *The Wages of Blood*, 24 ANIMAL L. 457, 459 (2018).

[8] THE GUARDIAN, *Two Amputations a Week, supra* note 1.

[9] U.S. Dep't of Lab., OSHA, Letter of Interpretation on Inspection Guidance for Animal Slaughtering and Processing Establishments (Oct. 15, 2024), https://www.osha.gov/laws-regs/standardinterpretations/2024-10-15; Peggy Lowe, *OSHA Injury Reporting Rule Sheds Light on Meat Packing Accidents*, NPR (Aug. 10, 2016),

18.    For decades, federal studies, medical literature, and workers' surveys have identified heightened work speed (or piece rate) as a primary factor in increasing the risk of injury.[10] "Work speed" is a combination of line speed and staffing.[11] "Line speed" is the rate of operation for production machinery.[12] Staffing refers to the number of workers at any given station on the line. Together these two factors determine how fast a worker must work and "the total number of motions that a worker must do."[13]

19.    A balanced work speed requires enough workers at a station to keep up with the line speed without adding more pressure or work to the individual worker. If a worker is out sick or injured, or there simply isn't enough room to add more workers, but the line speed persists at a higher rate, the workers at the station must work faster. Faster work is more dangerous:

> When hundreds of workers stand closely together, down a single line, wielding sharp knives, terrible things can happen when people feel rushed. The most common slaughterhouse injury is a laceration. Workers stab themselves or stab someone nearby. They struggle to keep up with the pace as carcasses rapidly swing toward them, hung on hooks from a moving, overhead chain. All sorts of accidents— involving power tools, saws, knives, conveyor belts, slippery floors, falling carcasses—become more likely when the chain moves too fast.[14]

---

https://www.npr.org/2016/08/10/489433692/osha-injury-reporting-rule-sheds-light-on-meat-packing-accidents; THE GUARDIAN, *Two Amputations a Week, supra* note 1.

[10] Israel Cook, *How Fast Is Too Fast? Osha's Regulation of the Meat Industry's Line Speed and the Price Paid by Humans and Animals*, 18 SUSTAINABLE DEV. L. & POL'Y 39 (2017) ("Dangerously fast slaughter line speeds are the leading cause of worker injuries due to the pressure to kill more animals in less time") (citing sources); Dillard, *Slaughterhouse Nightmare, supra* note 7, at 393.

[11] HRW: DEAD AND BURIED, *supra* note 1, at 49, n. 133 (citing sources).

[12] HRW: DEAD AND BURIED, *supra* note 1, at 50; Smith, *Speed of Profit*, *supra* note 1 at 129-30 (discussing dangers of line speed).

[13] *Id.* at 49.

[14] Eric Schlosser, *The Chain Never Stops*, MOTHER JONES, Jul./Aug. 2001, https://www.motherjones.com/politics/2001/07/dangerous-meatpacking-jobs-eric-schlosser/.

20.     Today, line speeds at a beef processing plant typically range from between 250 to 390 heads of cattle per hour, with 400 considered extremely high.[15] For the work speed to be proportionate at the rate of 400, a station might require 16-17 workers.[16] At such a rate, the cattle would be moving towards a worker at the rate of around one per ten seconds.

### JBS GREELEY

21.     JBS, along with its parents, subsidiaries, and affiliates, is a one of the largest animal protein producers in the world and the top beef producer in the United States. With an annual revenue of more than $72 billion, JBS operates nine beef processing facilities within the U.S., including a slaughterhouse and meat packaging plant at its headquarters in Greeley, Colorado. JBS and its affiliates also operate numerous pork and chicken processing facilities across U.S. The Greeley plant employs approximately 4,000 workers, making it the biggest employer in Weld County.[17]

22.     The JBS Greeley plant operates roughly 24 hours a day with workers assigned to one of three shifts. The A shift runs from 5:45 am to approximately 2:30 pm; the B shift from 3:00 pm to approximately 11:30 pm (the "Line Shifts"). The C shift is an overnight shift and consists of a cleaning crew responsible for sanitizing the facilities of the blood, feces, and bone debris left over from the Line Shifts. At times, the plant can operate 6-7 days a week.

---

[15] Melissa K Davis, et al., *Benchmarking current preslaughter management factors, welfare indicators, and meat quality outcomes at commercial fed cattle processing facilities in the United States*, 8 TRANSLATIONAL ANIMAL SCIENCE 1, 2 (2024), https://academic.oup.com/tas/article/doi/10.1093/tas/txad150/7505493; HRW: BLOOD, SWEAT AND FEAR, *supra* note 4, at 33; Schlosser, *The Chain Never Stops*, *supra* note 14.

[16] HRW: BLOOD, SWEAT AND FEAR, *supra* note 4, at 33.

[17] Alexander Kirk, *JBS announces $50 million expansion project at Greeley beef plant*, 9NEWS, Feb. 4, 2025, https://www.9news.com/article/money/business/jbs-expansion-project-beef-factory/73-afa03af3-d4de-48b1-8119-b2bc2e043c79.

23.    Virtually all operational and production employees at the JBS Greeley plant are represented by United Food and Commercial Workers International Union, Local 7 ("the Union"), for purposes of collective bargaining. The Union also began representing cleaning crew workers at the JBS Greeley plant in early 2024.

### 1. Production Floor

24.    Within each Line Shift, a worker is assigned to either the "kill" floor or the "fab" floor. The kill floor is where cows are stunned and slaughtered, a process that includes removing hides, eviscerating (removing organs), and trimming the carcasses as they swing by, hanging upside down by their feet.

25.    On the fab floor, workers prepare the meat for distribution to customers and restaurants by transforming the carcass into so-called primal cuts through deboning, chopping, trimming and/or grinding.

26.    The floors are sometimes referred to as the hot floor (kill) or cold floor (fab) due to the extreme temperatures of each: temperatures on the kill floor can reach up to 100 degrees in the summer, while temperatures on the cut floor are kept at around freezing, ranging from 32 to 36 degrees.

27.    Workers on both floors are assigned a specific, repetitive task along the line such as cutting out tongues, slicing off cheek meat, or trimming fat, as the product passes by. The line moves continuously at speeds set to maximize output, and each station must keep up. Workers stand within arm's length of each other and use hand knives, hooks, and mechanical cutting devices like head splitters, bone splitters, electric band saws, and circular saws.

28.    The number of employees needed to do a particular job at a particular line speed is referred to as "crewing."[18] JBS Greeley maintains a crewing guide that correlates the line speed to the number of qualified workers at various positions on the line. The crewing guide as of June 2024 included a maximum line speed of 390. Depending on the station, a line speed of 390 would require between 10 and 14 employees.

29.    During the Line Shifts, management sets the line speed and union stewards routinely monitor adherence to the guide. Management is required to notify the union representatives if it plans to adjust the line speed, to permit the union to ensure the line is adequately staffed. If a line exceeds safe speeds, a steward can request a slowdown or additional workers to ensure safety. Supervisors are required to write down the line speeds throughout the day, and line speeds are also posted on a monitor in the Fab Floor's General Manager's office.

### 2. Breaks

30.    JBS, through its contract with the Union, guarantees all Line Shift workers two rest periods of fifteen minutes each for a work schedule that exceeds six hours, as well as one unpaid lunch period of at least thirty minutes (but no longer than thirty-two minutes) ("mandated breaks").

31.    JBS management schedules the rest and meal periods for each shift.

32.    The general procedure for taking the mandated breaks is for employees in the slaughter area to stop placing beef on the chain. Employees begin their break when the gap in the chain reaches them, meaning that several dozens of workers take breaks at the same time. Prior to leaving the production floor, employees must remove at least some of their safety equipment,

---

[18] *Equal Emp. Opportunity Comm'n v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1210 (D. Colo. 2015) (citing JBS's statement of undisputed facts).

which can include hard hats, hair nets, safety goggles, gloves, boots, metal-mesh gloves, arm-guards, and aprons, and put it back on before returning to the line.[19]

33.    Because of the many dozens of workers taking a mandated rest break at the same time, the distance to the restrooms, and the time it takes to don and doff safety gear, not all workers may be able to use the bathroom at the mandated rest time.

34.    Absent mandated breaks, JBS policy is to allow workers to leave the line to get a drink of water or for restroom emergencies ("unscheduled breaks").[20] According to JBS, supervisors are trained to grant employees permission to leave the line for an unscheduled break when possible.[21]

## JBS RECRUITS HAITIAN REFUGEES

35.    In 2023, JBS Greeley needed workers.

36.    For more than a decade, JBS Greeley had relied heavily on refugees and other immigrants seeking humanitarian relief to fill its workforce. [22]

37.    JBS's recruitment of refugees was intentional and strategic. In 2007, JBS acquired Swift and Company, an American beef processor, after immigration raids at six of Swift's meatpacking plants in 2006 reduced its workforce by 10% almost overnight.[23]

---

[19] *Id.*

[20] *Id.*

[21] *Id.* at 1211.

[22] Shae Frydenlund & Elizabeth Cullen Dunn, *Refugees and racial capitalism: Meatpacking and the primitive accumulation of labor*, 95 POLITICAL GEOGRAPHY 102575, 3-4 (2022), https://par.nsf.gov/servlets/purl/10334452 [hereinafter Frydenlund & Dunn, *Refugees and racial capitalism*].

[23] *Id.*; Ted Genoways, Esther Honig, & Bryan Chou, *How America's largest beef producer exploits refugees for profit*, FERN, Sept. 1, 2025, https://thefern.org/2025/09/how-americas-largest-beef-producer-exploits-refugees-for-profit/ [hereinafter Genoways et al., FERN]; Ted Genoways,

38.    JBS began to work directly with refugee resettlement agencies and local service organizations to recruit immigrants with work authorization, first from Somalia, Eritrea, and the Congo; later, Myanmar, South Sudan and the Middle East.[24]

39.    Its recruitment strategy worked. Within a year of the raid, the foreign-born population of Greeley grew to 12,000, more than 12% of the town and a 60% increase from seven years earlier. With the influx of workers, JBS was able to bring on a second shift, consisting of 1,300 additional workers.[25]

40.    Other meatpacking plants followed JBS's model, and by 2020, more than 45 percent of all meatpacking workers were foreign-born.[26] That same year, JBS Greeley's foreign-born workforce was estimated to be much higher, around a staggering 80-90 percent.[27]

41.    In March 2020, COVID-19 hit the plant. Within a month, the director of Weld County's public health department declared the JBS Greeley plant a hot spot for COVID-19, causing the plant to close for two weeks.[28] In the next months, the virus infected hundreds of

---

*Immigrants on the Line*, MOTHER JONES, May/June 2025, https://www.motherjones.com/food/2025/03/haiti-migrant-meatpacking-jbs-labor-deportation/.

[24] Frydenlund & Dunn, *Refugees and racial capitalism*, supra note 18, at 3; Genoways, et al., FERN, *supra* note 19; Genoways, *Immigrants on the Line*, *supra* note 19.

[25] Genoways, et al., FERN, *supra* note 19.

[26] *Id.*

[27] *Id.*

[28] Tony Kovaleski, *Whistleblower says Covid-19 screening process at JBS plant places employees in danger*, DENVER7, Oct. 10, 2020, https://www.denver7.com/news/investigations/whistleblower-says-covid-19-screening-process-at-jbs-plant-places-employees-in-danger.

workers and left six dead.[29] By July 2020, the plant accounted for 65% of all confirmed COVID-19 cases in Colorado.[30]

42.    The deaths, and JBS's push to keep operations running during the pandemic, galvanized workers.[31] Those who could left for other jobs; those who stayed began to demand better treatment through walk-offs and hard-nosed negotiations.[32]

43.    In September 2021, JBS Greeley workers, through the Union, negotiated a collective bargaining agreement that resulted in higher pay, increased safety protocols and training, and better disability pay.[33]

44.    That same year, JBS settled a decade-long lawsuit filed by the EEOC on behalf of hundreds of Somali Muslim workers who alleged that JBS denied them the ability to pray as required by their religion, and that they were harassed when they tried to pray during scheduled breaks or even on bathroom breaks.

---

[29] Juan Vassallo, *Immigrants Helped Save This Illinois Meatpacking Town. Trump Cut Hundreds from its Workforce*, INVESTIGATE MIDWEST, Sept. 3, 2025, https://investigatemidwest.org/2025/09/03/immigrants-helped-save-this-illinois-meatpacking-town-trump-cut-hundreds-from-its-workforce/; Allison Sylte, *JBS workers in Greeley walk out of work amid pay dispute*, 9NEWS, Jul. 10, 2020, https://www.9news.com/article/news/local/jbs-workers-walk-out-pay-dispute/73-ad0fe3c0-9f6b-40ad-8e57-fd18aa576c71.

[30] Vassallo, *Immigrants Helped Save This Illinois Meatpacking Town, supra* note 29.

[31] Genoways, et al., FERN, *supra* note 19.

[32] Ted Genoways, Esther Honig, & Bryan Chou, *How an immigration raid reshaped meatpacking — and America*, HIGH COUNTRY NEWS, Sept. 1, 2025, https://www.hcn.org/issues/57-9/on-the-kill-floor-how-migrants-are-exploited-for-profit/.

[33] Press Release, JBS, UFCW Local 7 and JBS USA Reach Notable Collective Bargaining Agreement at the JBS Meat Processing Plant in Greeley, Colorado (Sept. 2, 2021), https://jbsfoodsgroup.com/articles/ufcw-local-7-and-jbs-usa-reach-notable-collective-bargaining-agreement-at-the-jbs-meat-processing-plant-in-greeley-colorado.

45.     And in 2022, the federal government discovered that JBS had been unlawfully employing children in dangerous jobs during overnight shifts in Greeley and other locations.[34]

46.     In the midst of this turbulence, JBS needed new workers. It found some: recently arrived Haitians, like Plaintiffs and members of the proposed class, who had received humanitarian parole or Temporary Protected Status ("TPS"), an immigrant designation reserved for foreign individuals who cannot return to their home countries safely due to dangerous or extraordinary country conditions like war, famine or natural disaster.

47.     These new recruits were an ideal replacement for the Muslim Somalis who required time to pray, or the workers who felt empowered by the bargaining agreement. As one JBS Greeley supervisor told a team of Somali workers in December 2023, JBS was getting new workers that would replace the Somalis because "they don't pray and they don't need to go to the bathroom."

48.     JBS Greeley's targeted recruitment of Haitians began in late 2023 after a Haitian resident of Colorado named Mackenson Remy ("Remy") met with a JBS Greeley HR supervisor, Edmond Ebah ("Ebah") at the JBS Greeley site.

49.     Ebah was an established recruiter for JBS Greeley. An immigrant from Benin, he started on the slaughter side of JBS Greeley in 2018 before swiftly rising to become an HR supervisor. In 2020, as JBS struggled to retain workers amid the pandemic, Ebah focused on recruiting workers from his home country. JBS rewarded his efforts with referral bonuses worth up to $1,500 per employee.[35]

---

[34] News Release, U.S. Dep't of Lab., US Department of Labor secures agreement with JBS USA, nation's largest meat packing processor, to address child labor compliance (Jan. 13, 2025), https://www.dol.gov/newsroom/releases/whd/whd20250113.
[35] Ted Genoways, *Immigrants on the Line, supra* note 19.

50.     Ebah was so successful in his recruitment efforts that JBS posted a video about him, noting he had helped more than 30 people join JBS.[36] The video also highlights his efforts to help the workers get to and from work once they arrived in Greeley, noting that, "as more and more people came, transportation became a challenge."

51.     At their first meeting, held at JBS's Greeley plant, Remy told Ebah that he had a TikTok channel targeted to Haitians in the U.S. and offered to use it to advertise JBS jobs.

52.     Ebah told Remy that JBS had at least 60 openings slaughtering, butchering and packaging meat. He said the job made good money, required no English language skills, and that it was a sure thing: if the Haitians came to Greeley, they would have a job at JBS.

53.     Using footage from inside the plant, Remy created a TikTok video advertising the jobs at JBS Greeley. Based on his conversations with Ebah, Remy included a voice over on the video in Haitian Creole telling his viewers that JBS was hiring workers, that if they came to Greeley, jobs would be guaranteed, that no English was required, and that the job was hard but paid well. He said that JBS would provide housing nearby while the workers got set up in Greeley. He encouraged those interested to send him a direct message through the TikTok app.

54.     JBS knew and approved of Remy's video. Remy filmed the video from inside JBS, based on information provided to him by a JBS recruiter. In later videos advertising the jobs, Remy filmed footage of the workers he recruited inside the facility. Because photography and video on the production floor at JBS are generally prohibited under JBS policy, Remy could only have filmed these videos with JBS's knowledge and permission.

---

[36]     *Id.*, *see also* Video posted by JBS USA, Facebook Reels, https://www.facebook.com/reel/182698166831937.

55.     Soon after he posted the video, Remy began receiving direct messages from interested Haitians all over the U.S. Believing that JBS had only 60 open positions, Remy contacted Ebah to ask him what he should do with the hundreds of inquiries. Ebah told him not to worry, "100, 200 people," tell them all to come, and he would take care of it. "Have them just book their flights tickets to Colorado, you and I will take care of the rest . . ." Ebah texted Remy. When Remy asked Ebah where they would all live, Ebah responded, "Don't worry anymore about where they are going to live, trusted [sic] me."

56.     Remy complied and began responding to the messages, telling those inquiring that the jobs were theirs if they came to Greeley, Colorado. All they had to do was come, and JBS would take care of the rest. Plaintiffs and the putative Class Members were among those who heeded this call.

## HAITIANS ARRIVE AT JBS GREELEY

57.     Plaintiffs and the putative Class Members were living in various states throughout the country when they got news of Remy's TikTok video.

58.     Plaintiff Pierre was living in Oklahoma when a friend of his told him about Remy's video.

59.     Plaintiff Jean-Louis was living in Indiana when he heard about the job advertised by the video.

60.     Plaintiff Saint Aubin was living in Maryland when he saw the TikTok video.

61.     Based on Remy's promises in the video or through subsequent conversations with him and his associates, Plaintiffs and Putative Recruitment Class members understood three things: (1) that if they came to Greeley, they would be hired at JBS; (2) the jobs at JBS required no English

language skills: and (3) JBS would "take care of them" while they got set up in Greeley, including housing and food.

62.     In reliance on these assurances, Plaintiffs and the Putative Recruitment Class Members left their various places of residence and traveled to Greeley, incurring transportation costs. They would not have left their places of residence if not for these guarantees.

63.     Remy charged Plaintiffs and all Putative Recruitment Class Members a fee in exchange for securing them the job ("recruitment fees"). Plaintiffs and Putative Class Members were told that if they paid the recruitment fees, they would be hired at JBS, they would be given a trip from the airport to a place to live, and they would be provided housing for a period of time while they got established in Colorado.

64.     Like others in the Putative Recruitment Class, Plaintiffs scraped together funds to pay the recruitment fees and make the trip to Colorado.

65.     Plaintiff Pierre paid approximately $275 for a flight from Oklahoma to Colorado, and an additional $220 in recruitment fees. He borrowed money to pay the travel and recruitment fees, which he repaid after he started the job at JBS.

66.     Plaintiff Jean-Louis paid approximately $397 for a flight from Indiana to Colorado, and an additional $320 in recruitment fees. He borrowed money for the travel and recruitment fees, which he repaid after he started the job at JBS.

67.     Plaintiff Saint Aubin paid between $300-400 for his flight from Maryland and paid another $100 in recruitment fees. He borrowed the money from a friend, whom he repaid after he started the job at JBS.

68.    The transportation costs and recruitment fees were business related expenses because they were primarily for the benefit of JBS, and JBS did not reimburse any of the costs paid by Plaintiffs or other Putative Recruitment Class Members at any time.

69.    The first Haitian workers recruited by Remy and Ebah began to arrive in Greeley in or around November 2023.

70.    Plaintiffs Pierre and Saint Aubin separately made it to Greeley on or about the end of December 2023, joining several dozens of other Haitians who had already arrived.

71.    As Plaintiffs and the Putative Recruitment Class Members began to arrive, JBS secured rooms for them at the Rainbow Motel, located about one mile from the JBS Greeley Plant. The company put Ebah in charge of the arrangement, which was supposed to provide incoming workers with two weeks of free accommodation.

72.    The Rainbow Motel consisted of 17 individual rooms each with one bed and one bathroom. There were no cooking facilities.

73.    Due to the influx of recruits, JBS placed Plaintiffs and the Putative Recruitment Class Members in these one-bed rooms with anywhere from three to eleven other Haitians, some of them strangers, and regardless of gender. Some of the rooms lacked adequate heat in the frigid winter temperatures.

74.    Plaintiff Pierre was placed in a room that felt like a jail cell with four other people including a woman and her baby. He had nowhere to sleep but the floor, close to the door to the outside where the frigid winter air seeped through.

75.    Plaintiff Saint Aubin was placed in a room with five, then seven, then eleven other Haitians, both women and men, including a baby, with only one bed and one bathroom. He and

several others had to sleep on the floor, so close they could scarcely move their heads without hitting each other. The smell was rancid: twelve people using one bathroom, twelve pairs of shoes, and the carpet on which he slept smelled of mildew. It was the middle of winter in Greeley, so most of them were staying inside, crowded together for hours at a time.

76.    When Plaintiff Jean-Louis arrived in March 2024, he too was placed at the hotel, initially in a room with four other men, two of them strangers. He was moved to a separate room with fewer residents, but it reeked and the carpet was caked in grime.

77.    In addition to the recruitment fees already collected, some of Plaintiffs and Putative Class Members were charged additional weekly fees for the crowded, fetid hotel rooms. JBS at all times was in control of whether and how much it would charge workers.

78.    Plaintiffs and Putative Recruitment Class Members, who understood from Remy and Ebah that JBS would take care of everything, arrived with little or no money and no means of transportation. They had to rely on Remy for trips to the grocery store or restaurants, but many did not have any money to spend. Plaintiff Saint Aubin spent the first two days without eating because he had no money.

79.    Remy charged the Plaintiffs and the Putative Class Members for trips to the grocery store and to the JBS plant. The commute to and from work consisted of one van that would take a group of workers to the plant, return to the hotel, take another group, and on until all workers had arrived. On the return trip, some of the workers had to stand outside in the freezing weather while the van made its multiple trips. In his first week of work, Plaintiff Pierre declined the ride home to avoid having to wait in the snow, opting to walk instead although the frigid temperatures made his nose bleed. Remy still demanded the commuting fee.

80.    Plaintiffs and Putative Class Members reasonably believed that Remy and Ebah were authorized by JBS to recruit and hire them. Upon arrival in Greeley, Remy took some of the Putative Class Members directly to JBS, where he was granted access to entry. Plaintiffs and Putative Class Members heard Remy call Ebah "my boss," on several occasions. Remy had access to the inside of the plant where he frequently met with Ebah and took video footage of the workers. On one occasion, members of the class saw Remy sitting with Ebah in the plant and joking that he should have his own office.

81.    Plaintiffs and Putative Class Members also reasonably believed that JBS authorized the recruitment scheme. JBS knew that Haitians were arriving every day because they were hiring dozens of them at a time. Although turnover at the plant is normally quite high, requiring a class of new hires to be trained each week, with the influx of the Haitians, new hire class sizes swelled, often consisting of dozens of newly hired individuals each week.

82.    JBS was also familiar with the challenges new recruits face when they arrive in Greeley without transportation, money or language skills. It knew, for example, that Ebah had bought a van to ferry new immigrant workers to and from JBS back when he started recruiting from West Africa. Yet, at no time did JBS intervene on behalf of the hundreds of Haitian recruits it employed to ensure that the employer-provided housing was habitable, or that the new recruits had adequate food or transportation. It left all those decisions to Ebah.

83.    JBS also knew or should have known that Remy would require compensation for his work for JBS, and effectively allowed the workers to subsidize his compensation instead of paying him outright.

84.     By January 2024, Remy sent a list of at least 50 Haitians residing in nine of the Rainbow Motel rooms to Ebah. At its peak, the 17-room motel was housing over 100 Haitians. Yet, Ebah and Remy continued to recruit them, bringing dozens of them to the hotel every week.

85.     As Haitians continued to arrive, JBS needed to continuously move workers out of the hotel to make room for the new recruits. After Plaintiff Pierre had been at the hotel for about two weeks, Remy told him that if he wanted to stay, he had to pay $500 a week.

86.     Similarly, after about two weeks at the hotel, Ebah told Plaintiff Jean-Louis that if he wanted to continue staying at the hotel he would have to pay $500.

87.     To make room for the new recruits at the hotel, JBS moved some of the recruits, including Plaintiff Saint Aubin, to houses rented by Ebah. In early January 2024, Plaintiff Saint Aubin came home to the hotel one day and found a note saying that he and approximately 40 others were being evicted from the hotel and moved to a nearby house.

88.     The house consisted of five bedrooms, two bathrooms, a living area and a kitchen. There was no furniture aside from one refrigerator. Plaintiff Saint Aubin and the other recruits who were moved to the house bought blankets to sleep on the floor. There was not enough room to lay down mattresses. At times, there was no electricity and no water.

89.     For these accommodations, each resident was required to pay at least $70 a week to Remy and Ebah, amounting to more than $11,000 a month.

90.     JBS continued to recruit Haitians, so that dozens of people were moving into the house at a time. At its height, between 40-60 Haitians were living in the house.

91.    Putative Recruitment Class Members complained to the Union about the abysmal housing conditions. The Union raised concerns about the treatment of Haitian workers with JBS as early as December 2023, and JBS hired outside counsel to investigate.

92.    As a result of JBS's investigation, two of Ebah's supervisors were terminated. Ebah was merely transferred to a new department. Even after the investigation, recruitment to the hotel and the house continued.

93.    The employer provided housing was necessary to do the job as there was no viable alternative non-employer housing within commuting distance of JBS and thus was primarily for the benefit of JBS.

94.    Despite the lack of living space, JBS continued to recruit and employ Haitians, and Ebah and Remy continued to collect money for rent and other services far in excess of their worth. Within a year, JBS's recruitment scheme added some 1,200 Haitians to JBS Greeley's payroll.

## HAITIANS BEGIN WORK AT JBS

95.    After arriving in Greeley, each Plaintiff and Putative Class Member was given paperwork, including a job application, in English, a language they didn't understand. Ebah filled out their paperwork and did not explain its contents.

96.    Plaintiffs Saint Aubin and Pierre started work at JBS Greeley on December 26, 2023.

97.    Plaintiff Saint Aubin is a Seventh Day Adventist and told Ebah that he could not work night shifts on Fridays, so he was assigned to the A shift.

98.    Plaintiff Pierre was assigned to the B Shift.

99.    Plaintiff Jean-Louis began work at JBS on March 11, 2024. He was assigned to the B shift.

100.    During their first week at JBS, each Plaintiff and Putative Class Member received a four-day orientation, designed to introduce them to the plant and train them in safety and work policies.

101.    Despite the enormous health and safety hazards involved with the work, JBS did not conduct trainings for Putative Class Members in Haitian Creole or any language the Haitian recruits understood fluently. Instead, the trainings were provided in English and Spanish.

102.    JBS was aware that Plaintiffs and the Putative Class Members spoke Haitian Creole and were not fluent in English or Spanish. They were recruited, at JBS's direction, by a Haitian citizen whose TikTok post advertising the position was in Haitian Creole and promised no English was needed. Ebah, the HR supervisor, personally filled out each Haitian recruit's job application and thus knew their language limitations.

103.    To overcome this barrier, and instead of hiring an interpreter or a training supervisor fluent in Haitian Creole, JBS's policy was to train the Plaintiffs and Putative Class members in a language they could not fully understand, and to then direct its training supervisors to falsify records on behalf of Plaintiffs and Putative Class Members stating that they understood the training, to ensure they could pass quickly and begin work as soon as possible.

104.    Meanwhile, JBS trained English and Spanish speaking hires in these crucial workplace policies and safety measures in their native languages. These hires thus were able to understand and complete their own training tests.

105.    Because of these obvious language barriers, JBS knowingly provided Plaintiffs and the Putative Class Members with a quality of safety training and job orientation that was significantly inferior to the quality of training and job orientation offered to White and Hispanic hires who were otherwise similarly situated.

106.    Plaintiff Saint Aubin attended orientation with mostly Hispanic hires. The training was conducted in English and Spanish, a language he only partially understands, but that the other hires in his group spoke and understood fluently. He did not feel prepared for his job or the dangers it posed.

107.    Plaintiff Jean Louis attended orientation for the B Shift with many other Haitian hires. The training was performed in English, a language he does not speak or understand fully.

108.    Plaintiff Pierre's training was conducted in English. He did not understand most of the training and did not feel like he knew how to safely complete the job duties that JBS expected him to perform.

### JBS POLICY OF FAILING TO TRAIN HAITIANS INCREASES RISK AND RATE OF INJURY

109.    JBS's policy of refusing to train Haitians in their native language or in a language in which they were fluent greatly increased the risk and rate of injury to Haitian workers.

110.    Following their orientation at JBS, the company assigned Putative Class Members various roles at JBS, all of which involved some element of the difficult and dangerous work described above. JBS assigned some of the newly recruited Haitian workers to work on the line, slaughtering cattle and disassembling the meat; it assigned others to jobs stacking and boxing heavy boxes; and still others to the tasks of using chemicals to sanitize and clean the plant.

111.     Regardless of the role to which JBS assigned them, many Putative Class Members experienced serious injuries while completing their work. These injuries included, but were not limited to, injuries from the knives they were using to cut apart the cattle, musculoskeletal injuries from performing difficult and repetitive motions, chemical injuries from the products they were directed to use for cleaning, amputations, severe burns, and lacerations.

112.     JBS's intentional failure to train Putative Class Members in their native language or in any language they understood had ripple discriminatory effects: it meant that the Putative Class Members lacked information not only about work hazards and safety protocols, but also about how to assert their rights about workplace safety and injuries.

113.     For example, JBS proudly touts its Open Door Policy and Ethics Line, which are intended to encourage JBS employees to report concerns, unethical behavior and policy violations to JBS management anonymously. [37] JBS claims that all new employees are introduced to the policies at new-hire orientation.[38] JBS's intentional failure to teach Putative Class Members about these policies disadvantaged them in comparison to their English and Spanish speaking counterparts.

114.     Likewise, JBS intentionally failed to provide Putative Class Members crucial information about their health and safety rights as related to workplace injuries and illnesses in their native language. This meant that after Haitian workers experienced an injury at work—which was incredibly likely, given the dangerous work and inadequate training—JBS purposefully made

---

[37] JBS USA: https://sustainability.jbsfoodsgroup.com/chapters/team-members/.
[38] *Id.*

it almost impossible for these workers to access the medical care and wage replacement to which they were entitled.

115.    In the case of serious injuries such as severe burns, the inability to breathe, or preeclampsia to name a few, JBS withheld information about workplace injuries and worker's compensation by providing Putative Class Members paperwork in English only. JBS then told Putative Class Members that if they went to the hospital for work-related injuries, they would be responsible for the costs of care themselves.

116.    JBS frequently directed Putative Class Members to sign paperwork relating to workplace injuries in a language they did not understand.

117.    For example, within his first year at JBS, Plaintiff Saint Aubin felt a bolt of pain shoot through his chest while he was working on the line. He went to the on-site clinic which provided him with a hot towel and sent him back to the floor. Plaintiff Saint Aubin was in so much pain he thought he had torn a muscle and requested to leave work but was told that if he left, he would be penalized.

118.    After returning to work, Plaintiff Saint Aubin's pain grew so intense that he could not breathe. JBS called an ambulance which took him to the hospital where he was instructed that his injury was work-related, and that he could not carry anything over eight pounds for at least eight weeks. When he provided Human Resources with his doctor's instructions, he was told in Spanish that they could not accommodate him and that he would have to take eight weeks of unpaid leave. From what he was able to understand of the conversation, no one at JBS informed him of his workers' compensation rights and instead, told him he must pay for the ambulance, and required him to take unpaid medical leave.

119.    JBS's refusal to train Putative Class Members in their native language also meant that they did not know or understand JBS policies relating to unscheduled bathroom breaks on the line, including when and whether they could take them.

120.    As a result, Plaintiffs and the Putative Discrimination Class Members have routinely been denied the ability to take a bathroom break outside of the mandated break times, including in cases of emergency. At times, Putative Discrimination Class Members have had to wait for hours to use the bathroom, causing extreme discomfort and pain.

121.    Because they believe they are not permitted to take an unscheduled break more than once a shift, Putative Discrimination Class Members, including Plaintiff Saint Aubin, routinely deny themselves water and food to avoid having to relieve themselves.

122.    Other Putative Discrimination Class Members have urinated in their clothes after being denied time to use the bathroom.

123.    By contrast, English and Spanish speaking workers at JBS are informed of JBS unscheduled break policies and are able to assert their right to use the bathroom. JBS routinely allows non-Haitian workers to leave production lines to use the bathroom more frequently than the Putative Discrimination Class Members.

124.    JBS compounded its failure to inform Black Haitian workers of their right to take reasonable unscheduled breaks by allowing supervisors to routinely deny them the opportunity to do so.

125.    After the Union hired a Haitian representative, several Putative Discrimination Class Members who learned of their right to complain filed grievances around JBS's policy of denying Haitian workers bathroom breaks. In response, JBS routinely agrees to take "appropriate

corrective measures." However, the policy has not changed, and Putative Discrimination Class Members continue to have bathroom breaks denied, causing pain and unavoidable urination while on the line.

## **JBS INTENTIONALLY SPEEDS UP THE B SHIFT LINE AFTER HAITIANS ARRIVE**

126.    The substantial risk of injury and illness caused by JBS's policy of failing to train Plaintiffs and the Putative Class Members in their native language was exacerbated on the B Shift, thanks to a second discriminatory JBS policy.

127.    Shortly after significantly increasing the number of Haitian workers at the plant, JBS began increasing the line speed on the shift where most of those people worked.

128.    When Plaintiff Saint Aubin arrived at JBS in December 2023 with some 40 other recruits, he was the only Haitian assigned to the A Shift. The vast majority of the A Shift is staffed with non-Haitian workers.

129.    At all relevant times from November 2023 to today, the vast majority of Haitian workers assigned to Line Shifts are assigned to the B Shift, and a plurality of workers on the B Shift, between 35-40%, are Haitian.

130.    At all relevant times, the supervisors on both Line Shifts are and have been predominantly English and/or Spanish speakers. Until mid-2025, no JBS Greeley Line Shift supervisor was Haitian or spoke Haitian Creole.

131.    Although the work performed on both Line Shifts is substantially the same, starting with the recruitment of Haitians to JBS in November 2023, JBS has implemented a policy of accelerating the line speed on the B Shift – which is staffed primarily by Haitian workers – to dangerously fast speeds.

132.    Line speeds on the A Shift toggle between 200 and 380, rarely exceeding the latter, and averaging close to 300. Line speeds on the B Shift trend noticeably higher, averaging around 370 and reaching as high as 440, rarely, if ever, settling below 300.

133.    The extraordinarily fast line speeds on B Shift far exceed JBS's typical line speeds, both historically for B Shift, and as compared with the A Shift. They also exceed the maximum line speed contemplated in the crewing guide, which caps the line speed at 390.

134.    The number of workers assigned to B Shift is not adequate to make the pace of the line manageable.

135.    Due to the dangerously fast line speeds, employees who work during JBS's B Shift are subjected to a higher risk of injury than those who work during JBS's A Shift.

136.    Plaintiff Pierre was assigned to "slaughter intestines" on the kill floor during the B Shift. His job consisted of sticking two of his fingers into the belly of the cow carcass and pulling the intestine with his fingers. He made this motion thousands of times a day. After a few days Plaintiff Pierre's hands were so swollen, he could not close them. Sometimes his hand would be stuck in the clawing position he used to pull the intestines out.

137.    Plaintiff Jean-Louis was assigned to trim fat during the B Shift. His job requires him to hold a hook in his non-dominant hand and a knife in his dominant hand. As meat travels along the line, he hooks the meat and slices it with his knife. The relentless speed of the line means that Plaintiff Jean-Louis does not have time to release the hook from his left hand between cuts, meaning his hand is stuck in a grip position for several hours a day. To this day, Plaintiff Jean-Louis is unable to fully close all the fingers on his left hand.

138.    Putative B Shift Class Members repeatedly complained to supervisors and the Union about the speed of the lines on the B Shift.

139.    Likewise, both staff and union stewards have repeatedly complained to management both in person and in writing that the lines on B Shift far exceed the crewing guide, and have repeatedly requested that the lines be slowed down.

140.    Union stewards frequently notified JBS management that the line was running above 400 while the line was not even crewed for 350.

141.    Union representatives also noted that the monitor in the Fab Manager's Office, which is supposed to reflect the line speed, was routinely off or frozen to reflect an inaccurate line speed.

142.    JBS managers also failed to notify Union representatives of alterations to the line speed, although required to do so.

143.    Often, JBS will slow the line when Union representatives are inspecting and then speed it up again once they leave.

144.    Despite the various and repeated complaints, JBS continues to run the B Shift lines at dangerously high speeds.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of Plaintiffs and several subclasses for which Plaintiffs seek certification. Pending any modifications necessitated by discovery, Plaintiffs preliminarily define three classes as follows:

**THE RECRUITMENT CLASS**: ALL BLACK HAITIAN WORKERS RECRUITED TO WORK AT JBS GREELEY AT ANY TIME AFTER NOVEMBER 1, 2023.

**THE DISCRIMINATION CLASS**: ALL BLACK HAITIAN WORKERS EMPLOYED BY JBS AT JBS GREELEY AT ANYTIME AFTER NOVEMBER 1, 2023

**THE B-SHIFT CLASS**: ALL BLACK HAITIAN WORKERS EMPLOYED BY JBS AT JBS GREELEY AND ASSIGNED TO WORK THE "B-SHIFT" ON THE PROCESSING LINE AT ANYTIME AFTER NOVEMBER 1, 2023.

146.    This action is properly brought as a class action for the following reasons, applicable to each Class and sub-Class:

   a.   Each Class is so numerous that joinder of all Class Members is impracticable. Each Class consists of hundreds of current and former employees who worked for JBS during the liability period.

   b.   Numerous questions of law and fact regarding the liability of Defendants are common to each Class and predominate over any individual issues which may exist.

   c.   For the Recruitment Class, common questions of law and fact exist and predominate over any questions solely affecting individual members, including but not limited to:

      i.   Whether JBS and its agents misrepresented the fees required to apply for or obtain employment;

ii. Whether JBS and its agents obtained improper or undisclosed fees for job applications, housing, and commuting;

iii. Whether JBS and its agents obtained business related expenses in the form of recruitment fees from Plaintiffs and the Class;

iv. Whether JBS improperly deducted amounts from Plaintiffs' and the Class's wages in the form of recruitment fees;

v. Whether JBS failed to pay Plaintiffs and the Putative Recruitment Class the state minimum wage during weeks in which they incurred business-related expenses;

vi. Whether JBS misrepresented the terms and conditions of the work by guaranteeing that no English language skills were required;

vii. Whether JBS mispresented the terms and conditions of the work by promising to provide housing to Haitian recruits;

viii. The proper measure of damages; and

ix. The proper measure of punitive damages.

d. For the Discrimination class, common questions of law and fact exist and predominate over any questions solely affecting individual members, including but not limited to:

i. Whether JBS failed to provide workplace safety and JBS policy training in a language spoken or understood by Black Haitian workers, while providing white and Hispanic workers, and/or

other workers who were not Black Haitian, training in their native languages;

 ii. Whether JBS failed to provide Black Haitian workers with crucial information that would have allowed them to assert their rights related to workplace safety, injuries, and JBS policies relating to unscheduled breaks while providing workers who were not Black Haitians, including white and Hispanic workers, such information in their native languages;

 iii. Whether JBS encouraged supervisors to routinely deny Black Haitian workers access to unscheduled breaks, even in emergency situations;

 iv. The proper measure of damages; and

 v. The proper measure of punitive damages.

e. For the B-Shift class, common questions of law and fact exist and predominate over any questions solely affecting individual members, including but not limited to:.

 i. Whether JBS imposed higher and unreasonably fast line speeds on Black Haitian workers in B shift than JBS imposed on workers in A shift, which was not primarily staffed with Black Haitian workers;

 ii. The proper measure of damages; and

 iii. The proper measure of punitive damages.

    f.   Although the exact amount of damages may vary among Class Members, the damages for the Class Members can be calculated using the same formula. The claims of all Class Members arise from a common nucleus of facts. Liability is based on a systematic course of wrongful conduct by Defendants that caused harm to all Class Members.

    g.   The claims asserted by Plaintiffs are typical of the claims of Class Members and the Class is readily ascertainable from Defendants' records. Plaintiffs were subjected to the same rules and policies as all other Class Members that form the basis of the alleged violation. Defendants applied their policies to Plaintiffs just as they did with all Class Members.

147.    Plaintiffs will fairly and adequately protect the interests of Class Members. The interests of Class Members are coincident with, and not antagonistic to, those of Plaintiffs. Plaintiffs are committed to this action and have no interests which conflict with the Class Members. Furthermore, Plaintiffs are represented by experienced class action counsel.

148.    Questions of fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### PATTERN AND PRACTICE OF
### DISCRIMINATORY TREATMENT BECAUSE OF RACE
(42 U.S.C. § 1981(b))
*On Behalf of Plaintiffs and the Putative Discrimination Class Members and the Putative B-Shift Class Members*

149.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

150.    Since at least November 2023 and continuing through at least July 2025, Defendants engaged in a pattern or practice of unlawful discriminatory employment practices at its facility in Greeley, Colorado, in violation of 42 U.S.C. § 1981(b) by discriminating against Plaintiffs with respect to the terms and conditions of their employment because of their race, ethnicity and ancestry.

151.    The pattern and/or practice of discriminatory treatment includes, *inter alia*, direct discrimination as well as disparate treatment based on Plaintiffs' and the Class' race, ethnicity and/or ancestry (Black/Haitian). These unlawful employment practices included:

   a.   Intentionally failing to provide workplace safety and JBS policy training in a language spoken or understood by Black Haitian workers, while providing workers who were not Black Haitians, including white and Hispanic workers, training in their native languages;

   b.   Directing JBS supervisors to falsify the results of safety training tests administered to Black Haitian workers, knowing the Black Haitian workers did not speak English or Spanish or understand the safety and JBS policy training tests;

34

    c.   Failing to instruct or inform Haitian workers of the availability of JBS policies and procedures that would have allowed Black Haitian workers to assert their workplace rights, including those related to work-place injuries, ethical violations and unscheduled breaks;

    d.   Directing Black Haitians to sign documents in English, knowing that they did not and could not understand them, that would affect their workplace rights, including forms related to employment policies and workers' compensation;

    e.   Subjecting Black Haitian workers to greater risk and rate of injuries by failing to inform them of workplace safety protocols and dangers;

152.   The effect of the practices complained of above has been to deprive the Plaintiffs and Putative Class Members of equal employment opportunities and otherwise adversely affect their employment status because of their race, ethnicity and/or ancestry.

153.   The unlawful employment practices complained of above were intentional.

154.   The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Plaintiffs and Putative Class Members.

155.   JBS has not compensated Plaintiffs or Putative Class Members for the various injuries and illnesses incurred as a result of this discrimination, and in fact, has required them to pay for their own medical treatment and related bills.

156.   As a result of Defendants' unlawful discriminatory acts, Plaintiffs and Putative Class Members have been damaged in an amount to be determined at trial.

157.    Plaintiffs and the Putative Class Members are entitled to all compensatory damages, including damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

158.    Plaintiffs and the Putative Class Members are also entitled to attorney's fees, costs, statutory interest, punitive damages, and all other relief deemed appropriate by the Court.

## SECOND CLAIM FOR RELIEF

**OBTAINING WORKMEN BY MISREPRESENTATION UNLAWFUL**
(C.R.S. § 8-2-104)
*On Behalf of Plaintiffs and the Putative Recruitment Class Members*

159.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

160.    Starting in November 2023, JBS, through its agents, brought Plaintiffs and Putative Recruitment Class Members into Colorado by means of false and deceptive representations, false advertising, and/or false pretenses concerning the kind and character of the work to be done, amount of the compensation to be paid for such work, and the conditions of the employment, including misrepresentations or omissions about, inter alia:

     a.   Business-related fees for housing, travel, drug test, application and/or commuting;

     b.   The lack of habitable employer-provided housing;

     c.   The need for English-speaking skills to understand the nature of their work and safety trainings.

161.    In reliance on JBS' misleading representations and omissions, Plaintiffs left their places of residence in other states to come to Colorado and work for JBS.

162.    As a result of JBS' unlawful conduct, Plaintiffs and Putative Recruitment Class Members have been damaged in an amount to be determined at trial, including but not limited to out-of-pocket costs for housing, recruitment, and travel, incurred by Plaintiffs and Putative Recruitment Class Members in reliance on JBS' promises.

163.    Plaintiff and the Putative Recruitment Class members are also entitled to attorney's fees, costs, statutory interest, exemplary damages, and all other relief deemed appropriate by the Court.

### THIRD CLAIM FOR RELIEF

**PATTERN OR PRACTICE OF DISCRIMINATORY TREATMENT
BECAUSE OF RACE, ETHNICITY, COLOR AND NATIONAL ORIGIN**
(42 U.S.C. §§ 2000e et seq. ("Title VII"))
*On Behalf of Plaintiffs Pierre and Jean-Louis and the Putative B-Shift Class Members*

164.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

165.    Since at least November 2023, Defendants have engaged and continue to engage in a pattern or practice of unlawful discriminatory employment practices at its facility in Greeley, CO, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by discriminating against Plaintiffs with respect to the terms and conditions of their employment because of their race (Black), color (Black), ethnicity (Haitian) and national origin (Haitian).

166.    The pattern and/or practice of discrimination includes, without limitation, direct discrimination, as well as disparate impact due to Defendants' imposition of unreasonably fast line speeds on the B shift, which is primarily (and intentionally) staffed with Black Haitian workers.

167.    The effect of the practices complained of above has been to deprive Plaintiffs Pierre and Jean-Louis and Putative B Shift Class Members of equal employment opportunities and

otherwise adversely affect their employment status, including by subjecting them to increased physical dangers and risk of injury, because of their race, color, national origin and ethnicity.

168.    The unlawful employment practices complained of above were and are intentional.

169.    The unlawful employment practices above were done with malice or with reckless indifference to the federally protected rights of Plaintiffs Pierre and Jean-Louis and Putative B Shift Class Members.

170.    As a result of Defendants' unlawful discriminatory acts, Plaintiffs Pierre and Jean-Louis and Putative B Shift Class Members have been damaged in an amount to be determined at trial.

171.    Plaintiffs Pierre and Jean-Louis and Putative B Shift Class Members are entitled to backpay as well as all compensatory damages, including damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

172.    Plaintiffs Pierre and Jean-Louis and Putative B Shift Class Members are also entitled to attorney's fees, costs, statutory interest, punitive damages, and all other relief deemed appropriate by the Court.

## FOURTH CLAIM FOR RELIEF

### COLORADO WAGE CLAIM ACT
(C.R.S. §§8-4-101, *et seq*.)
*On Behalf of Plaintiffs and the Putative Recruitment Class Members*

173.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

174.    At all material times, Defendants have been "employers" within the meaning of the Colorado Wage Act, C.R.S. § 8-4-101(6).

175.    At all material times, Defendants employed "employees," including Plaintiffs and Putative Recruitment Class Members, within the meaning of the Colorado Wage Act, C.R.S. § 8-4-101(5).

176.    As a result of the foregoing conduct, as alleged, Defendants passed along business related expenses onto the Plaintiffs and the Putative Recruitment Class Members, and as a result improperly deducted from Plaintiffs and Putative Recruitment Class Members for recruitment fees and employer-provided housing costs, in violation of the Colorado Wage Act, C.R.S. § 8-4-105.

177.    As a result of the foregoing conduct, as alleged, Defendants failed to pay wages due thereby violating, and continuing to violate, the Colorado Wage Claim Act. These violations were committed knowingly, willfully and with reckless disregard of applicable law.

178.    As a result, Plaintiffs and Putative Recruitment Class Members have been damaged in an amount to be determined at trial.

179.    Plaintiffs and the Putative Recruitment Class Members are entitled to all improperly deducted pay, as well as other compensatory damages, including damages for emotional distress, equitable relief, including equitable relief to deter future violations and prevent unjust enrichment, and penalties.

180.    To the extent this Complaint is considered a demand pursuant to C.R.S. § 8-4-109(3)(a), it is a demand for wages on behalf of Plaintiffs and Putative Recruitment Class Members as defined above, *i.e.*, a "demand for the payment on behalf of . . .  a group of similarly situated employees . . . ."

181.    Plaintiffs and the Putative Recruitment Class Members are also entitled to attorney's fees, costs, statutory interest, and all other relief deemed appropriate by the Court.

**FIFTH CLAIM FOR RELIEF**

**COLORADO MINIMUM WAGE ACT**
(C.R.S. §§ 8-6-101, *et seq.*)
*On Behalf of Plaintiffs and the Putative Recruitment Class Members*

182.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

183.    At all material times, Defendants have been "employers" within the meaning of the Colorado Minimum Wage Act.

184.    At all material times, Defendants employed, and continue to employ, "employees," including Plaintiffs and Putative Recruitment Class Members, within the meaning of the Colorado Minimum Wage Act.

185.    Plaintiffs and Putative Recruitment Class Members were employees of Defendants within the meaning of the Colorado Minimum Wage Act.

186.    As a result of the foregoing conduct, as alleged, Defendants have violated, and continues to violate, the Colorado Minimum Wage Act by, inter alia, failing to pay Plaintiffs and Putative Recruitment Class Members the Colorado state minimum wage during weeks in which they incurred business-related expenses.

187.    These violations were committed knowingly, willfully and with reckless disregard of applicable law.

188.    As a result, Plaintiffs and Putative Recruitment Class Members have been damaged in an amount to be determined at trial, including unpaid minimum wages and other damages.

189.    Plaintiffs and the Putative Recruitment Class members are also entitled to attorney's fees, costs, statutory interest, and all other relief deemed appropriate by the Court.

## SIXTH CLAIM FOR RELIEF

### CIVIL THEFT
(C.R.S. § 18-4-405)
*On Behalf of Plaintiffs and the Putative Recruitment Class Members*

190.    Plaintiffs incorporate by reference all paragraphs above.

191.    At all material times, Defendants have been "employers" within the meaning of the Colorado Minimum Wage Act.

192.    At all material times, Defendants employed, and continue to employ, "employees," including Plaintiffs and Putative Recruitment Class Members, within the meaning of the Colorado Minimum Wage Act.

193.    Plaintiffs and Putative Recruitment Class Members were employees of Defendants within the meaning of the Colorado Minimum Wage Act.

194.    JBS knew it unlawfully required Plaintiffs and Putative Recruitment Class Members to pay business expenses, reducing their wages below minimum wage because JBS knew it failed to compensate Plaintiffs and Putative Recruitment Class Members *at all* for these business expenses.

195.    JBS' knowing failure to pay minimum wage under the Colorado Minimum Wage Act constitutes theft pursuant to C.R.S. § 18-4-401. *See* C.R.S. § 8-6-116.

196.    As a result, JBS' failure to pay minimum wage constitutes civil theft pursuant to C.R.S. § 18-4-405.

197.    Plaintiffs and Putative Recruitment Class Members are entitled to treble damages and attorney's fees to be determined at trial.

198.    Plaintiffs and Putative Recruitment Class Members are also entitled to costs, statutory interest, and all other relief deemed appropriate by the Court.

## SEVENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
*On Behalf of Plaintiffs and the Putative Recruitment Class Members*

199.    Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

200.    Starting in or around November 2023, JBS, through Ebah and Remy, charged Plaintiffs and Putative Recruitment Class Members to live in overcrowded, uninhabitable housing at the Rainbow Hotel and then at a house rented by Ebah and Remy. The so-called rent far exceeded the value of the housing resulting in thousands of dollars in profit for Remy and Ebah.

201.    Remy also charged Plaintiffs and Putative Recruitment Class Members for the daily commute to and from the JBS Greeley worksite and trips to the grocery store. These fees also far exceeded the cost of any mileage required to make the 2-mile roundtrip commute to work or to get groceries, resulting in significant profit for Remy.

202.    Having left their residences in other states, invested in illegal recruitment fees, and landed in Greeley with no English language skills or knowledge of the area, Plaintiffs and the Putative Recruitment Class Members were in no position to negotiate the fees or find alternative residences and/or commuting options.

203.    Remy and Ebah were agents of JBS whose recruitment efforts directly benefited JBS. The massive profits Remy and Ebah made from charging Plaintiffs and Putative Recruitment

Class Members excessive fees served as incentive for them to continue recruiting Haitian workers. The influx of Haitian workers in turn allowed JBS to fill employment vacancies, including the B Shift, with Haitian workers, speed up the lines, and staff the C shift, resulting in millions of dollars in profit for JBS.

204.    The benefits conferred on JBS were received at the expense of Plaintiffs and Putative Recruitment Class Members and it would be unjust for JBS to retain the benefit without commensurate compensation to Plaintiffs and Putative Recruitment Class Members.

205.    As a result of JBS's unlawful conduct, Plaintiffs and Putative Recruitment Class Members have been damaged in an amount to be determined at trial.

206.    Plaintiffs and Putative Recruitment Class members are also entitled to attorney's fees, costs, statutory interest, and all other relief deemed appropriate by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

As to Plaintiffs' First Claim for Relief brought under 42 U.S.C. § 1981(b) for discrimination based on race,

    a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

    b.  Plaintiffs and others be awarded all compensatory damages, including damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

    c.  Plaintiffs and others be awarded punitive damages;

    d.  Plaintiffs and others be awarded attorney's fees and costs;

e.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate.

As to Plaintiffs' Second Claim for Relief brought under C.R.S. § 8-2-104,

a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

b.  Plaintiffs and others be awarded all damages incurred in reliance on Defendant's promises regarding the nature of the work to be performed, and conditions of employment, including but not limited to out-of-pocket costs for housing, recruitment, and travel;

c.  Plaintiffs and others be awarded exemplary damages;

d.  Plaintiffs and others be awarded attorney's fees and costs;

e.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate.

As to Plaintiffs' Third Claim for Relief brought under Title VII,

a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

b.  Plaintiffs and others be awarded all compensatory damages incurred as a result of Defendants' discriminatory acts, including but not limited to future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

c.  Plaintiffs and others be awarded punitive damages;

d.  Plaintiffs and others be awarded attorney's fees and costs;

e.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate.

As to Plaintiffs' Fourth Claim for Relief brought under the Colorado Wage Claim Act, C.R.S. § 8-4-101,

    a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

    b.  Plaintiffs and others be awarded all unpaid balances of the full amount of wages or compensation owed to them;

    c.  Plaintiffs and others be awarded punitive damages;

    d.  Plaintiffs and others be awarded attorney's fees and costs;

    e.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate.

As to Plaintiffs' Fifth Claim for Relief brought under the Colorado Minimum Wage Act, C.R.S. § 8-6-101,

    a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

    b.  Plaintiffs and others be awarded all unpaid minimum wages;

    c.  Plaintiffs and others be awarded attorney's fees and costs;

    d.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate;

As to Plaintiffs' Sixth Claim for Relief, brought under C.R.S. § 18-4-405 for Civil Theft as a result of Defendant's failure to pay minimum wages,

    a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

    b.  Plaintiffs and others be awarded all unpaid minimum wages;

    c.  Plaintiffs and others be awarded treble damages;

    d.  Plaintiffs and others be awarded attorney's fees and costs;

e.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate;

As to Plaintiffs' Seventh Claim for Relief, brought for Unjust Enrichment,

a.  This Claim be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3);

b.  Plaintiffs and others be awarded damages incurred as a result of Defendants' retention of benefits at the expense of Plaintiffs and others, including but not limited to, costs incurred as part of the recruitment process, employer-provided housing and commute; and disgorgement of profits made by Defendant as a result of its ability to speed up the B Shift line due to the arrival and employment of Plaintiffs and others;

c.  Plaintiffs and others be awarded attorney's fees and costs;

d.  Plaintiffs and others be awarded such other and further relief as may be necessary and appropriate.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted this 16th day of December, 2025.

**NICHOLS KASTER, PLLP**

*/s/ Anna P. Prakash*
Matthew H. Morgan
Anna P. Prakash
Joshua R. O'Neill
(*Application for Admission Pending*)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
morgan@nka.com
aprakash@nka.com
joneill@nka.com

**FARMSTAND**
Amal Bouhabib
(*Application for Admission Forthcoming*)
Hannah Wolf
(*Application for Admission Forthcoming*)
**FARMSTAND**
712 H St NE Suite 2534
(202) 595-8816
amal@farmstand.org
hannah@farmstand.org

**TOWARDS JUSTICE**
Juno Turner
Toree Lindblad
(*Application for Admission Forthcoming*)
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
toree@towardsjustice.org